**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> KAGG LOUNGE, INC., an Illinois Corporation, and CARMELA T. DALMACIO d/b/a Enfuzion Industries, an Illinois Individual. <br><br> Defendants. | Case No. 14-cv-03575 |

**COMPLAINT**

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned counsel, hereby alleges as follows:

**JURISDICTION AND VENUE**

1.      This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125.  This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.      This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to Slep-Tone's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of Illinois and in this judicial district.

4.     This Court has personal jurisdiction over each Defendant, in that each of them resides in this State and judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

5.     Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

6.     Defendant CARMELA T. DALMACIO ("DALMACIO") is an individual doing business as Enfuzion Industries, who resides in Lombard, Illinois.  DALMACIO is engaged in the business of providing karaoke entertainment, and she conducts her business at multiple venues in this State.

7.     Defendant KAGG LOUNGE, INC. is an Illinois corporation that, upon information and belief, operates an establishment known as "Stardust Bowl" in Addison, Illinois. KAGG LOUNGE, INC. operates a commercial establishment to which karaoke entertainment is provided by DALMACIO as entertainment for Stardust Bowl's patrons, as an inducement for their patronage and purchase of food, drink, and other concessions.

## BACKGROUND FACTS

8.     Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the trademark SOUND CHOICE.

9.      Slep-Tone is recognized as a leading producer of high-quality karaoke accompaniment tracks and has invested more than $18 million to re-record and replicate the authentic sound of approximately 18,000 popular songs across different eras and genres of music.

10.     Slep-Tone's dedication to producing music of the highest quality and the most authentic character led to its SOUND CHOICE label being the most recognizable and sought-after in the industry.

11.     Throughout its history, Slep-Tone has released its products for commercial use exclusively on physical media—initially, cassette tapes, and then compact discs beginning in approximately 1994.

12.     Originally, Slep-Tone's compact discs contained karaoke tracks encoded in a special format known as "CD+G," or "compact disc [audio] plus graphics," that allows for synchronized playback of audio and video suitable for prompting singers with lyrics cues.

13.     CD+G discs required special players that were capable of decoding the CD+G format.

14.     More recently, computer technology that allows the karaoke tracks stored on compact discs in CD+G format to be decoded and "ripped" (copied) to a computer hard drive has become widely available.

15.     Copies of karaoke tracks stored on media other than the original compact discs are referred to as "media-shifted copies" because they have been duplicated from the original media and written to non-original media.

16.     Media-shifting also frequently involves format-shifting, the conversion from the original format (such as CD+G) to another format (such as MP3+G or WAV+G).

17.     As the price of computer hard drives of ever-larger size has fallen, professional users now have the technical ability to store a large number of karaoke accompaniment tracks on hard drives for convenient transport to their karaoke shows, without also carrying large numbers of compact discs.

18.     As a result, most professional karaoke operators have shifted to the use of ripped karaoke tracks stored on computer media such as hard drives as a matter of convenience.

19.     However, the same technology is capable of being used not only for convenience but also to allow—on a technical level—the operator to use more music than he or she has paid for and, in some cases, to avoid paying for music at all.

20.     Karaoke operators, like DALMACIO, have used the available technology to copy one purchased disc to two or more computer systems for simultaneous use; to copy their patrons' discs to the operator's computer hard drive at a show; to "swap" song files with other operators; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with copies of karaoke tracks; and to sell off their original media in the secondary market once they have ripped those media to a hard drive.

21.     The foregoing activities nearly drove Slep-Tone out of business because it became relatively easy to obtain free, or at a nominal cost, illicit copies of products that would cost tens of thousands of dollars if purchased at retail.

22.     Historically, Slep-Tone opposed the shifting of SOUND CHOICE karaoke tracks to alternative media, warning purchasers of CD+G discs that unauthorized copying was a violation of applicable laws.

23.     Beginning in 2009, however, Slep-Tone established a media-shifting policy ("MSP") that imposes mandatory rules for karaoke operators who use media-shifted copies of SOUND CHOICE karaoke tracks to provide commercial karaoke services.

24.     Briefly stated, the MSP requires compliance with four conditions:  (a) 1:1 ("one-to-one") correspondence, meaning that for every media-shifted SOUND CHOICE karaoke track on a given medium such as a computer hard drive, the operator owns and maintains possession of a lawful original SOUND CHOICE karaoke track on its original medium, on a one-copy-for-one-original basis; (b) that the original media that form the basis for 1:1 correspondence are placed "on the shelf," i.e., not used for any purpose at all; (c) that the operator notify Slep-Tone that he or she has media-shifted karaoke tracks; and (d) that the operator submit to and be certified as having passed an audit of the operator's systems to verify complete compliance with the MSP.

25.     The basis of Slep-Tone's authority to require compliance with the MSP is its right to control the commercial use of its federally registered trademarks and, as to some tracks, its ownership of copyright in the synchronized audiovisual words represented by and in the sound recordings associated with those tracks.

26.     If an operator complies with all four conditions of the MSP, then that operator is granted permission from Slep-Tone, co-extensive only with Slep-Tone's rights in the subject matter, to use the media-shifted copies to provide commercial karaoke services.

27.     If an operator fails to comply with any of the conditions of the MSP, then none of the media-shifting the operator has conducted is permitted, authorized, or tolerated by Slep-Tone.

## THE RIGHTS OF THE PLAINTIFF

28.     Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

29.     Plaintiff Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

30.     Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

31.     Plaintiff Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

32.     Slep-Tone has, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendants, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

33.     Principally, the Sound Choice Marks are indicators of Slep-Tone as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by Slep-Tone or at its direction and under its control.

34.     Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the Sound Choice Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

35.     Slep-Tone has used its trade dress continuously and substantially exclusively for a period of decades.

36.     The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

37.     The aforementioned trade dress serves to distinguish Slep-Tone's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

38.     The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

39. No competitor of Slep-Tone is required to use any element of the Trade Dress to accomplish the cueing function, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the cueing function.

## ACTIVITIES OF DEFENDANTS

### Defendant DALMACIO

40. DALMACIO provides karaoke services to various venues in Illinois, principally concentrated in the Chicago metropolitan area, including Stardust Bowl, the venue operated by KAGG LOUNGE, INC.

41. On information and belief, in order to provide services, rather than using original karaoke discs that she possesses (if she indeed possesses such discs), DALMACIO relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

42. On information and belief, DALMACIO relies upon at least one such computer hard drive described in paragraph 41 herein.

43. On information and belief, DALMACIO created, or directed another to create, or otherwise acquired from a third party the files that are stored on her computer hard drive(s).

44. On information and belief, DALMACIO does not maintain a 1:1 correspondence relationship between her hard drives and original discs she might have lawfully acquired.

45. Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on DALMACIO's computer hard drives at the time those files were so stored.

46. Rather, on information and belief, the files were created by or at the behest of DALMACIO for purposes of the Trademark Act.

47.     On information and belief, many of the files stored on the DALMACIO's computer hard drives are representative of karaoke tracks originally created by Slep-Tone and are marked with the Sound Choice Marks.

48.     When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

49.     Slep-Tone did not authorize DALMACIO to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

50.     As such, the placement of the Sound Choice Marks and the Trade Dress upon DALMACIO's computer files is a false designation of the origin of those computer files.

51.     At all times relevant to the causes of action stated herein, DALMACIO has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

52.     DALMACIO's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE branded tracks.

53.     A patron or unwitting customer of DALMACIO, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of DALMACIO's shows, is likely to be confused into believing, falsely, that Slep-Tone created the tracks in use or authorized their creation.

54. DALMACIO's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because she is paid to provide access to and play those computer files and tracks at karaoke shows.

55. Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which DALMACIO is compensated and which inure to her benefit.

56. On information and belief, DALMACIO's piracy of accompaniment tracks is not limited to Slep-Tone's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

57. On information and belief, DALMACIO facilitated karaoke shows at multiple venues in this State.

58. On information and belief, the Sound Choice Marks were displayed on video monitors during various songs played by DALMACIO.

59. Slep-Tone obtained photographs and videos of displays of the Sound Choice Marks.

60. On information and belief, DALMACIO has not complied with Slep-Tone's MSP, and therefore her use of the Sound Choice Marks were not authorized proper use.

### Defendant KAGG LOUNGE, INC.

61. KAGG LOUNGE, INC. hired DALMACIO to provide commercial karaoke services at its establishment, Stardust Bowl.

62. KAGG LOUNGE, INC. has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

63.     Slep-Tone or its representatives informed KAGG LOUNGE, INC. of the infringing and counterfeit character of KAGG LOUNGE, INC.'s contractor's karaoke accompaniment tracks in or around June of 2013.

64.     In or around June of 2013, Slep-Tone offered KAGG LOUNGE, INC. the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable Slep-Tone to assess whether those contractors are operating legally.

65.     Slep-Tone also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

66.     As a result of Slep-Tone's efforts, KAGG LOUNGE, INC. has actual knowledge of the infringing and counterfeit nature of DALMACIO's karaoke materials.

67.     Despite that knowledge, KAGG LOUNGE, INC. failed and refused to terminate DALMACIO's services.

68.     Despite that knowledge, KAGG LOUNGE, INC. continued to receive a financial benefit from the provision of infringing karaoke services at their establishments by DALMACIO, through the attraction of paying patrons to their establishments.

69.     As such, KAGG LOUNGE, INC. operated in actual or apparent partnership with DALMACIO, in a symbiotic relationship from which both benefit.

70.     KAGG LOUNGE, INC. is liable for the acts of trademark infringement directly engaged in by DALMACIO on their respective premises or for their benefit.

## **DAMAGES**

71.     DALMACIO's unauthorized use of Slep-Tone's trademarks has damaged Slep-Tone.

72.     DALMACIO damaged Slep-Tone in an amount to be proven at trial but not less than $25,000 for each karaoke system she owns or operates and which contains karaoke tracks that infringe the Sound Choice Marks as detailed above, based upon their foregone purchases of original media.

73.     DALMACIO has also enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

74.     DALMACIO's illicit activities have also allowed it to compete unfairly against Slep-Tone's legitimate customers by lowering its cost of doing business through piracy of the music materials it uses.

75.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which DALMACIO operates by helping to crowd higher-cost but legitimate operators out of the market.

76.     DALMACIO's acts deprived Slep-Tone of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

77.     The Venue Defendants' unauthorized use of and benefit from the use of the Sound Choice Marks have damaged Slep-Tone both in the aggregate and individually.

78.     The Venue Defendants have damaged Slep-Tone in an amount of at least $100,000.

79.     Moreover, by exerting illegitimate and unfair pressure upon the market for

karaoke services in this State and judicial district through the use of pirated material belonging to

Slep-Tone and to other manufacturers, the Venue Defendants have cost Slep-Tone in excess of

$100,000 in revenue from legitimate sources crowded out of the market by the Venue

Defendants' piracy.

**FIRST CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**AGAINST DEFENDANT CARMELA T. DALMACIO**

80.     Slep-Tone repeats and incorporates by reference herein its allegations contained

in Paragraphs 1 through 79 of this Complaint.

81.     DALMACIO used and knowingly directly benefited from the use of a

reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection

with the provision of services including karaoke services, by manufacturing or acquiring the

reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by

displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress

during the provision of those services.

82.     Use of the Sound Choice Marks and the Trade Dress by Defendants were "in

commerce" within the meaning of the Trademark Act of 1946 as amended.

83.     Slep-Tone did not license DALMACIO to manufacture or acquire reproductions,

counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection

with the provision of their services.

84.     Use of the Sound Choice Marks and the Trade Dress by DALMACIO in this

manner is likely to cause confusion, or to cause mistake, or to deceive their customers and

patrons into believing that their services are being provided with the authorization of Slep-Tone and that their music libraries contain bona fide Sound Choice accompaniment tracks.

85.     On information and belief, the acts of DALMACIO were willful, knowing, and intentional.

86.     Slep-Tone has been damaged by these infringing activities.

87.     Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**AGAINST DEFENDANT CARMELA T. DALMACIO**

88.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1 through 79 of this Complaint.

89.     On each occasion DALMACIO caused or permitted an unauthorized counterfeit duplicate of a Slep-Tone accompaniment track to be played during a karaoke show at a given establishment, the Sound Choice Marks and the Trade Dress were displayed in connection with DALMACIO's karaoke services.

90.     The display of the Sound Choice Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved the DALMACIO's services and commercial activities.

91.     The display of the Sound Choice Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those

present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased or otherwise licensed by DALMACIO.

92.     DALMACIO's use of Slep-Tone's marks and trade dress in this fashion or in a more appropriate fashion would have inured to the benefit of Slep-Tone if DALMACIO had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

93.     Because Slep-Tone has been denied this revenue, it has been damaged by DALMACIO's uses.

94.     On each occasion when DALMACIO caused or permitted an accompaniment track pirated from a manufacturer other than Slep-Tone to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with the DALMACIO's karaoke services.

95.     Upon information and belief, DALMACIO's use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact DALMACIO or an upstream but unauthorized provider of the track was the origin of that track.

96.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that DALMACIO acquired in a legitimate manner.

97.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by DALMACIO.

98.     DALMACIO's use of the false designations of origin in this fashion damages Slep-Tone by enabling DALMACIO to provide or obtain karaoke services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers, can provide or obtain them.

99.     The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

100.    Because Slep-Tone has been denied this revenue, it has been damaged by DALMACIO's false designations of origin relating to other manufacturers.

101.    Unless enjoined by the Court, the DALMACIO's unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**THIRD CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**AGAINST DEFENDANT KAGG LOUNGE, INC.**

102.    Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1 through 79 of this Complaint.

103.    KAGG LOUNGE, INC. knowingly directly benefited from the use of, and through DALMACIO used, a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of karaoke entertainment services, by displaying and permitting to be displayed the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

104.    KAGG LOUNGE, INC.'s use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

105.    Slep-Tone did not license KAGG LOUNGE, INC. to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the services provided at its establishment Stardust Bowl.

106.    Use of the Sound Choice Marks in the manner attributable to KAGG LOUNGE, INC. is likely to cause confusion, or to cause mistake, or to deceive KAGG LOUNGE, INC.'s customers into believing that the services those customers are receiving are being provided with the authorization of the Slep-Tone using bona fide, legitimate, authorized karaoke accompaniment tracks.

107.    KAGG LOUNGE, INC.'s acts were willful and knowing.

108.    Slep-Tone has been damaged by infringing activities of KAGG LOUNGE, INC.

109.    Unless enjoined by the Court, KAGG LOUNGE, INC.'s infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**FOURTH CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**AGAINST DEFENDANT KAGG LOUNGE, INC.**

110.    Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1 through 79 of this Complaint.

111.    On each occasion when KAGG LOUNGE, INC. permitted a Slep-Tone accompaniment track to be played during a karaoke show, KAGG LOUNGE, INC. permitted the display of the Sound Choice Marks in connection with DALMACIO's karaoke entertainment services.

112.    The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be

deceived into believing, falsely, that Slep-Tone sponsored or approved KAGG LOUNGE, INC.'s services and commercial activities.

113.     The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased by DALMACIO's for use in providing karaoke entertainment services.

114.     KAGG LOUNGE, INC.'s use of the Sound Choice Marks in this fashion would have inured to the benefit of Slep-Tone if DALMACIO had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

115.     Because Slep-Tone has been denied this revenue, it has been damaged by the KAGG LOUNGE, INC.'s uses.

116.     On each occasion when KAGG LOUNGE, INC. permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, KAGG LOUNGE, INC. permitted the display of the words, names, and symbols of the other manufacturer in connection with DALMACIO's karaoke services.

117.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that DALMACIO acquired in a legitimate manner.

118.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are

likely to be deceived into believing, falsely, that the works being performed were sold

those manufacturers and purchased by DALMACIO.

119.     KAGG LOUNGE, INC.'s use of the false designations of origin in this fashion

damages Slep-Tone by enabling KAGG LOUNGE, INC., through DALMACIO, to

provide karaoke entertainment services at a lower cost than persons who acquire those

materials legitimately, including the Slep-Tone's legitimate customers.

120.     The consequential denial of revenue from a legitimate market for Slep-Tone's

customers' services prevents Slep-Tone's customers from making purchases of material

from Slep-Tone and is thus a denial of revenue to Slep-Tone.

121.     Because Slep-Tone has been denied this revenue, it has been damaged by KAGG

LOUNGE, INC.'s false designations of origin relating to other manufacturers.

122.     Unless enjoined by the Court, KAGG LOUNGE, INC.'s unfair competition

activities as described above will continue unabated and will continue to cause harm to

the Slep-Tone.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Slep-Tone prays for judgment against DALMACIO, KAGG

LOUNGE, INC., and that the Court:

A.     Find that Defendants  committed acts of infringement, including but not limited to

counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.     Find that Defendants engaged in unfair competition detrimental to Slep-Tone in

violation of 15 U.S.C. § 1125(a);

C.     Enter judgment against Defendants and in favor of Slep-Tone on all applicable

counts;

D.      Find the activities of Defendants were in all respects conducted willfully and for profit;

E.      Award to Slep-Tone the profits of Defendants and the damages sustained by Slep-Tone because of the conduct of Defendants in infringing the Sound Choice Marks, the Sound Choice Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $25,000 for each karaoke system operated by DALMACIO, and not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from KAGG LOUNGE, INC.;

F.      Award to Slep-Tone the profits of Defendants and the damages sustained by Slep-Tone because of Defendants acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $25,000 for each karaoke system operated by DALMACIO, and not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from KAGG LOUNGE, INC.;

G.      Award to Slep-Tone treble, punitive, or otherwise enhanced damages, as available, for acts of willful infringement by and in the amount of $100,000 from KAGG LOUNGE, INC.;

H.      Order all computer disks, drives, or other media belonging to DALMACIO, which media contain counterfeits of Slep-Tone's marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.      Grant Slep-Tone preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by DALMACIO and KAGG LOUNGE, INC.;

J.      Award Slep-Tone its costs and attorney fees, to the extent not awarded above; and

K.      Grant Slep-Tone such other and further relief as justice may require.

Respectfully submitted this 15th day of May 2014.

Respectfully Submitted,

/s/ Vivek Jayaram

Vivek Jayaram
Jayaram Law Group
33 North LaSalle Street
Chicago, IL 60602
Ph: 312.454.2859
vivek@jayaramlaw.com
www.jayaramlaw.com
Illinois Bar #6284388
Attorney for Plaintiff